**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **LESZEK PAWELKOWSKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:21-cv-882-MAB** |
| | ) | |
| **VICKI WALKER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on three motions for summary judgment filed by (1) Doris Williams (Docs. 116, 117), (2) Lynn Pittman, Carissa Luking, and Wexford Healthcare Sources (Docs. 118, 119), and (3) Lorie Cunningham (Doc. 120). For the reasons set forth below, all three motions for summary judgment are GRANTED.

## BACKGROUND

Plaintiff Leszek Pawelkowski ("Plaintiff") filed this civil rights action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while incarcerated at Lawrence Correctional Center ("Lawrence") (Doc. 36). Specifically, Plaintiff alleges that Doris Williams ("Dr. Williams"), Lynn Pittman ("Dr. Pittman"), Carissa Luking ("NP Luking"), and Lorie Cunningham ("Cunningham") were deliberately indifferent to his serious medical needs and Wexford Healthcare Sources ("Wexford") engaged in a practice of disallowing prisoners from accessing medical care outside of Lawrence (*Id.* at 3). As detailed in the Court's Screening Order pursuant to 28 U.S.C. § 1915A (Doc. 36),

Plaintiff was permitted to proceed on the following claims:

> **Count 1:** Eighth Amendment claim against Dr. Pittman, Dr. Williams, P.A. Luking, and Cunningham for exhibiting deliberate indifference to Plaintiff's arm/hand issues and pain.
>
> **Count 2:** Eighth Amendment claim against Wexford for its unconstitutional policy, practice, or custom of not allowing inmates to receive special testing from outside medical providers which resulted in a denial of constitutionally adequate medical treatment for Plaintiff's arm/hand issues and pain.
>
> **Count 3:** Eighth Amendment claim against Walker for denying Plaintiff access to medical care on August 20, 2020 and requiring him to continue working while in pain.

Process was never served on Defendant Vicki (Vicky) Walker, who was accordingly dismissed from this lawsuit without prejudice (Doc. 67). Dr. Williams, Dr. Pittman, NP Luking, Cunningham, and Wexford ("Defendants") all moved for summary judgment (Docs. 116, 118, 120).[1] Plaintiff filed one joint response in opposition to Defendants' motions for summary judgment (Doc. 125). All Defendants filed reply briefs (Docs. 128, 129, 130).

**<u>FACTS</u>**

Plaintiff claims that Defendants were deliberately indifferent to his severe joint arthritis and associated pain, in addition to his pain from a fall at Lawrence in August 2020 (Doc. 36, p. 3; Doc. 117-2, p. 10). Plaintiff's deliberate indifference claims are based on the following interactions between Plaintiff and Defendants.

---

[1] Defendants Pittman, Luking, and Wexford Health Services filed a joint motion for summary judgment (Doc. 119) and a joint reply brief (Doc. 128).

Dr. Pittman

Dr. Pittman is a licensed physician practicing in Illinois (Doc. 119, p. 2). Plaintiff saw Dr. Pittman in early 2020 for complaints of hearing loss (Doc. 119-1, pp. 65; Doc. 119-2, pp. 78, 84). Dr. Pittman referred Plaintiff to an audiologist (*Id.*). Dr. Pittman then saw Plaintiff again in June 2020 for complaints related to a preexisting perirectal injury (Doc. 119-2, p. 91). There is nothing in Dr. Pittman's notes that reflects any sort of complaint or reference to Plaintiff complaining about pain in his left arm/side or shoulder (*Id.*). Dr. Pittman did not see or treat Plaintiff again after this visit in June 2020 (Doc. 119-1, p. 9; *see* Doc. 119-2).

Dr. Williams

Dr. Doris Williams, M.D. was a physician at Lawrence from February 9, 2021 through June 18, 2021 (Doc. 117-1, p. 1). Dr. Williams saw Plaintiff once on February 18, 2021 for Plaintiff's complaint of recurring mid-sternal chest pain (*Id.* at 2). Dr. Williams conducted a physical exam of Plaintiff and reviewed his electrocardiogram and labs to determine that Plaintiff had increased blood pressure and inflammation to the muscles and cartilage of his chest (*Id.* at 3). On physical examination, Dr. Williams noted that Plaintiff did not appear in any acute distress (*Id*). Dr. Williams did not interpret Plaintiff's physical state or complaints to her at the time to be urgent (*Id.* at 4). Dr. Williams did not have any other interactions with Plaintiff (*Id.*).

NP Luking & Plaintiff's medical history from 2020 to 2023

In 2020, NP Luking treated Plaintiff twice (Doc. 119-2, pp. 110, 116). NP Luking's initial meeting with Plaintiff was on October 1, 2020, when Plaintiff came to NP Luking

with complaints of pain in his left arm, shoulder, and hand (*Id.* at 110). Luking prescribed Plaintiff ibuprofen and muscle rub, then told Plaintiff to return in four weeks (*Id.*). At their next appointment, on November 23, 2020, Plaintiff complained of more pain, and Luking prescribed Plaintiff 25 mg of Pamelor, a medication known to treat nerve pain (*Id.* at 116).

a. 2021

In 2021, Plaintiff saw NP Luking on February 15, 2021, when Plaintiff complained of left arm pain but maintained full range of arm motion (*Id.* at 128). Luking again prescribed Plaintiff ibuprofen and muscle rub (*Id.*). Throughout the rest of 2021, Plaintiff was seen by Lawrence providers other than NP Luking, including another nurse practitioner, a physician, and a physical therapist (Doc. 119-1, p. 3-5). In May 2021, Plaintiff was seen by NP Stover for multiple medical issues including arm pain (Doc. 119-2, p. 136). NP Stover prescribed Plaintiff 200 mg Tegretol to treat Plaintiff's chronic arm pain (*Id.*). In July 2021, Plaintiff told NP Stover that ibuprofen stops his pain and Plaintiff received more ibuprofen for his back pain (*Id.* at 146, 150). On September 29, 2021, Plaintiff saw Lawrence physician Dr. Savino and complained of left arm, shoulder, and hand pain (*Id.* at 160). Savino noted that Plaintiff "failed to report his history well and clearly," then proceeded to order Plaintiff a shoulder x-ray and a physical therapy evaluation (*Id.*).

The x-rays Dr. Savino ordered showed degenerative changes in Plaintiff's shoulder but were otherwise normal (Doc. 140, p. 9). On October 27, 2021, Dr. Savino ordered Plaintiff a physical therapy evaluation, which Plaintiff received but forcefully

resisted and did not cooperate with (Doc. 119-2, pp. 166-67). As a result of this evaluation, Emily Thomann, DPT recommended four weeks of physical therapy (*Id*. at 167), which Plaintiff completed on November 1, 2021, November 4, 2021, November 12, 2021, and November 19, 2021 (*Id.* at 172-179). On December 1, 2021, Plaintiff was evaluated by Emily Thomann, DPT (*Id.* at 184). Plaintiff reported to Thomann that his neck pain had improved but his left side pain had not improved, though Thomann noted that Plaintiff had not been compliant with physical therapy and discharged Plaintiff from physical therapy (*Id.*). Finally, on December 10, 2021, Plaintiff was seen in nurse sick call and the nurse referred Plaintiff to a provider (*Id.* at 190).

b. 2022

On February 22, 2022, Plaintiff was seen at Lawrence for left shoulder pain amidst other complaints, during which Plaintiff asked for stronger pain medication (*Id.* at 216). At the same appointment, a provider ordered an x-ray of Plaintiff's cervical spine and a computed tomography (CT) scan of his shoulder (*Id.*). The provider also prescribed Plaintiff Naproxen (*Id.*). The results of Plaintiff's cervical spine x-ray were normal but showed degenerative changes due to his age and the CT scan showed no left shoulder abnormality (Doc. 119-1, p. 5;[2] Doc. 119-2, p. 408). On May 17, 2022, Plaintiff was seen in nurse sick call due to his complaints of left arm and hand pain (Doc. 119-2, p. 238). The nurse referred Plaintiff to a provider (*Id.*). On May 25, 2022, NP Luking's involvement in

---

[2] NP Luking's affidavit states that Plaintiff's CT scan of his shoulder showed no abnormality. She based this statement on a citation to the record that is not on Court's docket. Nevertheless, Plaintiff still admitted this fact, so the Court is citing to NP Luking's affidavit (Doc. 119-1) as the source for this fact.

Plaintiff's care restarted when she refilled Plaintiff's pain medication prescription based on a request from another nurse (*Id.* at 244). On June 3, 2022, another NP reviewed Plaintiff's chart (*Id.* at 252). The treating nurse practitioner ordered a left shoulder MRI because an outside radiologist who interpreted the shoulder CT scan recommended a left shoulder MRI (*Id.*). The MRI was approved about a month later, on June 7, 2022 (*Id.* at 254). On July 28, 2022, NP Luking met with Plaintiff in a follow-up appointment, where NP Luking explained that the MRI could not be scheduled until outside providers were available (*Id.* at 266-67). On October 20, 2022, Plaintiff underwent MRI imaging at Carle Richland Memorial Hospital (*Id.* at 472). The MRI revealed a small labrum tear in Plaintiff's shoulder (*Id.*). NP Luking reviewed the MRI result with Plaintiff and, due to Plaintiff's torn labrum, referred Plaintiff to an orthopedic specialist (*Id.* at 312-13). Finally, on December 15, 2022, Plaintiff was seen by another nurse practitioner who prescribed Mobic, a drug for arthritis, and ordered imaging to try to diagnose Plaintiff's arthritis (*Id.* at 344).

c. <u>2023</u>

In early 2023, the results of Plaintiff's most recent x-ray imaging revealed mild arthritic changes in his left hand (Doc. 140, p. 10). On April 26, 2023, NP Luking saw Plaintiff for left hand pain and prescribed Plaintiff Tegretol pain medication and reviewed Plaintiff's x-ray, which showed mild degenerative disc disease (Doc. 119-1, p. 6).[3] On May 15, 2023, NP Luking reviewed Plaintiff's most recent radiology results

---

[3] NP Luking makes this assertion in her affidavit (Doc. 119-1, p. 6). She supports this statement with a citation to Doc. 119-2, LOC pp. 935-36. These pages were not included in Doc. 119-2. However, again

showing degenerative disc narrowing (*Id.* at 7).[4] NP Luking explained her plan of care to Plaintiff who agreed to a plan of: discontinuing Tegretol, prescribing 400mg Gabapentin, ordering an MRI of the lumbar spine and a neurosurgery consult, and reminded Plaintiff of his pending referral to an orthopedic physician (*Id.*).[5] On June 9, 2023, Plaintiff was seen by orthopedic specialist Brian Cummings, PA with Carle Sports medicine, who described Plaintiff's condition as mild osteoarthritis with mild subacromial spurring (Doc. 125-1, p. 2). Dr. Cummings did not recommend surgery, but did recommend a cortisol injection, which Dr. Cummings administered to Plaintiff on-site, as well as physical therapy, and working with a spine specialist (*Id.*).

On July 7, 2023, Plaintiff was scheduled for a follow-up MRI of his cervical spine with Carle Richland Memorial Hospital on September 28, 2023 (Doc. 119-1, p. 7).[6] The results of this MRI showed degenerative changes and reflected Plaintiff's chronic arthritis but did not reveal an acute injury or disc herniation (Doc. 140, p. 8). Plaintiff underwent another physical therapy evaluation and more sessions, though Plaintiff's potential to improve from physical therapy was determined to be "poor" due to lack of Plaintiff's cooperation (*Id.* at 6). On October 13, 2023, Plaintiff requested to discontinue physical

---

Plaintiff admitted to these facts in his response brief (Doc. 125). Therefore, the Court will treat this fact as admitted.

[4] NP Luking's Affidavit supports this statement with a citation to Doc. 119-2, LOC p. 1194. Again, these pages were not included in Doc. 119-2. However, Plaintiff admits these facts in his response brief (Doc. 125), and the Court will therefore treat this fact as admitted.

[5] Again here, NP Luking's Affidavit (Doc. 119-1) cites to Doc. 119-2, LOC pp. 941-43, which were not included in that document. However, because Plaintiff admitted this fact in his response brief (Doc. 125), the Court will treat this fact as admitted.

[6] NP Luking's Affidavit (Doc. 119-1, p. 7) cites to Doc. 119-2, LOC p. 977 to support this assertion. However, this page was not included in Doc. 119-2. Nevertheless, Plaintiff admits this facts in his response brief (Doc. 125) and the Court will therefore treat this fact as admitted.

therapy (*Id.* at 7).

Cunningham

Defendant Cunningham is the Health Care Unit Administrator ("HCUA") at Lawrence (Doc. 120-4, p. 1). Cunningham is a registered nurse but does not treat patients in her role as an administrator at Lawrence (*Id.*). Cunningham reviewed Plaintiff's medical records in response to administrative inquiries but never treated Plaintiff (Doc. 136, pp. 1-2; Doc. 117-2, p. 19). Plaintiff says he told Cunningham about his arm, neck, and shoulder pain outside of the medical treatment center and claims that Cunningham ignored his complaints (Doc. 117-2, p. 19).

## MOTION FOR SUMMARY JUDGMENT

1. Summary Judgment Standard:

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.'" *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010) (quoting FED. R. CIV. P. 56(c)). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Substantive law determines which facts are considered material. *See Jaranowski v. Indiana Harbor Belt R.R. Co.*, 72 F.4th 744, 749 (7th Cir. 2023). Moreover, although a non-movant receives the benefit of conflicting evidence and reasonable inferences, he or she is still required to

produce sufficient evidence to establish the essential elements of his or her claims. *Jackson v. Sheriff of Winnebago County, Illinois*, 74 F.4th 496, 500 (7th Cir. 2023).

Additionally, as outlined in Local Rule 56.1(g), "[a]ll material facts set forth in a Statement of Material Facts or a Statement of Additional Material Facts shall be deemed admitted for purposes of summary judgment unless specifically disputed." Consequently, when a party fails to respond as outlined in Local Rule 56.1, "we depart from our usual deference towards the non-moving party" and accept all of the moving parties' "unopposed material facts as true." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013). "Nevertheless, the Court is cognizant that 'a nonmovant's failure to respond to a summary judgment motion, or failure to comply with Local Rule 56.1, does not, of course, automatically result in judgment for the movant. [The movant] must still demonstrate that it is entitled to judgment as a matter of law.'" *Pratt v. Bebout*, No. 3:21-CV-1262-MAB, 2024 WL 1013920, at *3 (S.D. Ill. Mar. 8, 2024) (quoting *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012)).

2. Analysis

Prison officials violate the Eighth Amendment prohibition against cruel and unusual punishment when they are deliberately indifferent to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A plaintiff can make an Eighth Amendment deliberate indifference claim against prison officials when he or she presents evidence demonstrating that Plaintiff: (1) suffered an objectively serious medical condition; (2) the defendant knew of that condition and was deliberately indifferent to treating him; and (3) the defendant's deliberate indifference injured him. *See Stockton v.*

*Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022). A prison official who knows of a substantial risk of harm to a prisoner and fails to act or acts in disregard of that risk has a sufficiently culpable state of mind. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (internal quotation marks omitted). Difference of opinion among physicians regarding medical treatment for prisoners does not constitute deliberate indifference, nor does medical malpractice. *Id.* The deliberate indifference standard "requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). This standard is "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citation omitted).

Plaintiff's deliberate indifference claim is based on his left arm and hand issues and pain, from both severe bone joint arthritis (Doc. 36, pp. 2-3) and a shoulder injury from a fall (Doc. 117-2, p. 10). Defendants do not contest that Plaintiff suffers from a serious medical condition (*see* Docs. 117, 119, 120). Accordingly, the Court will assume for the purposes of summary judgment that Plaintiff suffers from a serious medical condition from both his arthritis and shoulder injury. The Court therefore will focus its analysis on the subjective component of Plaintiff's deliberate indifference claim – i.e. whether the Defendants knew of the Plaintiff's serious medical condition and were deliberately indifferent to it.

### A. Drs. Pittman and Williams

For Drs. Pittman and Williams to have been deliberately indifferent to Plaintiff's serious medical condition, there must first be evidence that each of them had actual

knowledge of Plaintiff's serious medical condition. *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) ("[D]eliberate indifference requires…actual knowledge of the risk.") (internal quotations and citation omitted). Turning first to Dr. Pittman, it is undisputed that he saw Plaintiff in early 2020 for complaints about Plaintiff's hearing loss (Doc. 119-1, pp. 9, 65; Doc. 119-2, p. 78). Dr. Pittman referred Plaintiff to an audiologist (*Id*.). Dr. Pittman then saw Plaintiff again in June 2020 for complaints related to a preexisting perirectal injury (Doc. 119-2, p. 91). There is nothing in Dr. Pittman's notes that reflects any sort of complaint or reference to Plaintiff complaining about pain in his left arm/side or shoulder (*Id*.). Plaintiff's contention that he saw Dr. Pittman for his arm and shoulder pain at some unspecified time is simply not supported by any record evidence and is pure speculation. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) ("Speculation is no substitute for evidence at the summary judgment stage."). Rather, the medical records confirm that Dr. Pittman saw Plaintiff on two occasions, both of which predated the onset of Plaintiff's complaints in this case in August 2020. There is simply no evidence that Dr. Pittman had knowledge of Plaintiff's serious medical condition, nor could he form the requisite mental state to act with deliberate indifference. Dr. Pittman is entitled to summary judgment.

The Court turns next to Dr. Williams, who similarly only saw Plaintiff once for an unrelated medical complaint of chest pain (Doc. 117-1, p. 2). Plaintiff contends that during his one visit with Dr. Williams, he complained of unspecified "shoulder" pain, but Dr. Williams "didn't want to listen" (Doc. 117-2, p. 24). On physical examination, Dr. Williams noted that Plaintiff did not appear in any acute distress (Doc. 117-1). Moreover,

the purpose of Plaintiff's visit with Dr. Williams concerned his complaint of chest pain, which Dr. Williams diagnosed and treated by administering a steroid injection and prescribing an anti-inflammatory for days (Doc. 117-1). Dr. Williams notes that even if Plaintiff did complain to her about issues with his left arm/hand (or shoulder), she would have referred him to nurse sick call to be appropriately referred because the complaint was not urgent or emergent (Doc. 117-1). Indeed, Dr. Williams was not obliged to treat Plaintiff for an unrelated complaint for arm or shoulder pain during a separate medical visit when Plaintiff did not appear in any acute distress and the pain did not appear to be emergent. *See Rankin v. Baker,* 770 Fed. Appx. 752 (7th Cir. 2019*); Lowe v. Kaplan,* 308 Fed. Appx. 993, 996 (7th Cir. 2009). *See also Burns v. Jackman*, No. 3:19-CV-771-MAB, 2023 WL 2683175, at *9 (S.D. Ill. Mar. 29, 2023) (explaining that, like non-incarcerated individuals, patients only see a doctor for the medical issue for which the patient is scheduled). Because Plaintiff was not suffering from a medical emergency regarding his left shoulder, arm, or hand that required immediate, on the spot medical attention, Dr. Williams would have acted appropriately in directing Plaintiff to go through the nurse call process to be seen for his pain. *Burns*, 2023 WL 2683175, at *9 (granting summary judgment in favor of nurse practitioner when the nurse required an inmate to refer to the nurse call protocol to report another medical complaint, instead of addressing the new complaint in the moment, when the inmate's condition was not an emergency).

Plaintiff further contends that he submitted three requests for treatment to Dr. Williams before his visit with her and two after the visit, but Dr. Williams ignored those requests (Doc. 117-2, pp. 23-25). Dr. Williams takes issue with this contention (Doc. 129,

p. 3). But even construing this dispute in favor of Plaintiff and taking him at his word, there is no record evidence demonstrating or indicating that Dr. Williams received any of Plaintiff's request slips nor is there any evidence that she personally ignored these requests for treatment. *Burns*, 2023 WL 2683175*11 (granting summary judgment to the defendant nurse practitioner when the plaintiff "offer[ed] nothing more than his own unsubstantiated speculation that [Defendant was] responsible for the delays, which…is insufficient to raise an issue of fact and survive summary judgment."). Indeed, Dr. Williams' affidavit indicates that she never reviewed or otherwise had any knowledge of the requests Plaintiff claims to have submitted (Doc. 117-1, p.4). In short, there is simply no evidence that Dr. Williams personally and recklessly ignored Plaintiff's sick call requests. *Rankin v. Baker*, 770 Fed. Appx 752, 754 (7th Cir. 2019) (affirming the district court's finding of no Eighth Amendment violation, in part because Plaintiff did not offer evidence that Defendants recklessly ignored Plaintiff's sick call requests).

For the preceding reasons, both Dr. Pittman and Dr. Williams are entitled to summary judgment.

**B. NP LUKING**

Plaintiff contends that NP Luking was also deliberately indifferent to his serious medical condition. However, after carefully considering the evidence, and for the reasons outlined below, NP Luking is entitled to summary judgment.

First, there is ample evidence that NP Luking had actual knowledge of Plaintiff's severe joint arthritis and left side pain (Doc. 119-1, p. 3). Accordingly, the question before the Court is whether NP Luking was deliberately indifferent such that she made

treatment decisions "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396. In the context of medical professionals, treatment decisions are "presumptively valid" and entitled to deference so long as they are based on professional judgment—meaning they are fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm, and the efficacy of available treatments—and do not go against accepted professional standards. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (citation omitted); *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017); *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011).

NP Luking argues that she is entitled to summary judgment because she was consistently engaged in Plaintiff's treatment in a manner that forecloses a deliberate indifference claim (Doc. 119, pp. 14-15). Plaintiff responded to NP Luking's motion for summary judgment by narrowing his argument to the delays he experienced in his treatment, namely that (1) Plaintiff experienced a several month then years long delay in receiving care, during which time Plaintiff consistently complained of side pain, and (2) NP Luking should have changed her course of treatment beyond the provision of pain medication when Plaintiff's medical condition did not improve (Doc. 125, p. 10). NP Luking counters Plaintiff's argument that she acted each time Plaintiff complained of pain to her, never ignored his complaints, and made good-faith efforts to provide Plaintiff effective treatment (Doc. 128, p. 4).

The Court will turn first to the issue of whether NP Luking unconstitutionally delayed Plaintiff's care. In this context, the Court must "examine the totality of an

inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). Plaintiff describes an initial delay in accessing imaging and a physical therapy evaluation: Plaintiff originally complained of his side pain in August 2020, but did not see NP Luking until 42 days later in October 2020, Plaintiff then waited a year before an x-ray was ordered and a physical therapy evaluation, which occurred in September 2021, and Plaintiff experienced a several month wait for an MRI, despite complaining of pain during that yearlong time frame (Doc. 125, p. 5-6).

NP Luking initially saw Plaintiff on October 1, 2020, November 23, 2020, and February 15, 2021 (Doc. 119-2, pp. 110, 116, 128). On each of these three occasions, NP Luking responded to Plaintiff's complaints of pain by prescribing ibuprofen, Pamelor, and muscle rub (*Id.*). NP Luking did not see Plaintiff again until February 2022 to refill Plaintiff's medications (*Id.* at 244), then again on July 28, 2022, when NP Luking advised Plaintiff that he was being scheduled for an MRI, which would occur as soon as outside providers were available (*Id.* at 266-67). On October 25, 2022, NP Luking reviewed Plaintiff's MRI results with him (*Id.* at 312-13). Because Plaintiff's recent MRI revealed a torn labrum in his shoulder, NP Luking ordered an orthopedic specialist referral when she interpreted Plaintiff's MRI results (*Id.*).

As a general matter, NP Luking is only responsible for the care she was personally involved in. *See Burns*, 2023 WL 2683175, at *11 (granting summary judgment to a defendant against whom Plaintiff did not offer evidence affirmatively showing, "or even impliedly suggesting," that the defendant was responsible for Plaintiff's treatment

delays). In each instance when NP Luking saw Plaintiff, she either (1) prescribed him pain medication (Doc. 119-2, pp. 110-111, 116, 128, 244, Doc. 140, p. 1), (2) prescribed him muscle rub (Doc. 119-2, pp. 110, 128), (3) reviewed imaging results with him (*Id.* at pp. 312-13), or (4) referred him to an orthopedic specialist (*Id.* at 474). There is no evidence that NP Luking played any role in the 42-day delay between Plaintiff's initial complaint of pain in August 2020 and his first meeting with NP Luking in October 2020. Moreover, Plaintiff fails to explain or offer any evidence to connect the dots and or demonstrate how NP Luking played any role in not ordering an x-ray sooner or in getting Plaintiff in for an MRI sooner after the referral had been made. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) ("the plaintiff must show that the defendant's actions or inaction caused the delay in his treatment."). Moreover, Plaintiff has not offered any expert testimony or verifying medical evidence to suggest that a delay in treatment, and not the underlying condition, caused some degree of harm. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) ("In cases such as this one—where the plaintiff alleges the defendant delayed, rather than denied, medical treatment—we have required that the plaintiff present verifying medical evidence that the delay, and not the underlying condition, caused some harm.") (citation omitted); *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (finding that "expert testimony that the [prisoner] suffered because of a delay in treatment" could serve as verifying medical evidence). In an effort to avoid this conclusion, Plaintiff cites to excerpts from medical websites (see Doc. 12, pp. 7-8), but these materials are "inadmissible hearsay and therefore may not be considered on summary judgment." *Mathis v. Carter*, No. 13 C 8024, 2017 WL 56631, at *4 (N.D. Ill.

Jan. 5, 2017) (declining to consider excerpts from medical websites as hearsay, which do not fit within any of the applicable exceptions to the hearsay rule). Rather, the evidence shows that NP Luking acted in response to Plaintiff's complaints based on her understanding of his needs and was not the cause of any purported delay in Plaintiff's medical care.

Plaintiff next contends that he received ineffective care from NP Luking because she should have changed course from only prescribing pain medication once Plaintiff's condition did not improve (Doc. 125, p. 10). But the evidence tells a different story. Plaintiff admitted that his pain improved with Ibuprofen (Doc. 119-2, p. 146). Plaintiff was uncooperative with physical therapy on several occasions (*see e.g. Id.* at 166-67; 168-169, 184; Doc. 140, p. 6) and Plaintiff shared his opinion that physical therapy exercise would not help him (Doc. 119-2, p. 169). The medical records and NP Luking's affidavit demonstrate that NP Luking's treatment decisions were based on her medical judgment when considering Plaintiff's reported symptoms, the objective findings of Plaintiff's imaging, and Plaintiff's own complaints of pain (Doc. 119-1, pp. 2, 9). There is simply no evidence to suggest or infer that NP Luking acted recklessly when assessing and prescribing treatment for Plaintiff's pain. *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

Moreover, when NP Luking returned to Plaintiff's care on July 28, 2022, she saw him for his left shoulder pain and maintained existing referrals and consults already in

process (Doc. 119-2, pp. 266-67)), advised Plaintiff of his upcoming MRI (*Id.*), reviewed the results of that MRI with Plaintiff (*Id.* at 312-13), and referred Plaintiff to an orthopedic specialist based on his MRI results which revealed a torn labrum in his shoulder (*Id.*). Again here, there is simply no evidence to demonstrate that NP Luking acted recklessly when assessing and prescribing treatment for Plaintiff's pain. Rather, it appears NP Luking responded to Plaintiff's presentation of pain and altered the course of treatment when he came back into her care in 2022.

Finally, Plaintiff contests that he was only able to see an orthopedic specialist rather than an orthopedic surgeon, further contributing to his ineffective care (Doc. 125, p. 10). However, Plaintiff's preference for surgery over meeting with an orthopedic specialist is merely a preference for a difference course of treatment and does not amount to deliberate indifference. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *Gallo v. Sood*, 651 Fed. Appx. 529, 533 (7th Cir. June 1, 2016) (claim focusing on failure to give prisoner's favored medication over medication prescribed by doctor "amounts to a disagreement over treatment, which is insufficient to show deliberate indifference."). Plaintiff does not present evidence to show NP Luking's referral to an orthopedic specialist, rather than a surgeon, was a conscious disregard of so great a risk as to inflict cruel and unusual punishment upon Plaintiff. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). In fact, underscoring the appropriateness of the referral made by NP Luking is that the orthopedic specialist that Plaintiff saw recommended a cortisone injection, which the specialist gave to Plaintiff on site, and recommended physical therapy (Doc. 125-1, p. 3). Plaintiff's mere preference for surgery does not rise the level of an Eighth Amendment

violation. Forbes, 112 F.3d at 267 ("Under the Eighth Amendment, [plaintiff] is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to her."). In sum, there is simply no evidence from which a reasonably jury could find that NP Luking acted with deliberate indifference in her care and treatment of Plaintiff. NP Luking is entitled to summary judgment.

### C. CUNNINGHAM

Plaintiff's final deliberate indifference claim is against Lawrence's Health Care Unit Administrator ("HCUA") Cunningham. When an inmate submits a grievance concerning medical treatment, Cunningham, as an administrator, may be asked by counselors, grievance officers, and/or the Administrative Review Board to review an individual's medical file and provide a summary of the treatment the individual in custody is or is not receiving (Doc. 120, p. 3). Cunningham responded to one inquiry into Plaintiff's medical chart and two accommodation requests regarding Plaintiff's care (*Id.* at 3, 4). Cunningham contends that she acted reasonably and without deliberate indifference in her review of Plaintiff's medical record. Cunningham also claims that she entitled to qualified immunity (Doc. 120, pp. 9-10). Plaintiff argues that Cunningham ignored his several complaints of pain to her (Doc. 117-2, p. 19).

The Seventh Circuit dealt with a similar issue in *Johnson v. Doughty*. 433 F.3d at 1004-05. In that case, the prisoner plaintiff sued three prison doctors and seven prison officials, claiming that the defendants were deliberately indifferent in their non-surgical treatment of his hernia. *Id.* at 1003. The district court granted summary judgment to

nearly all non-medical prison officials, finding the officials were not deliberately indifferent to Plaintiff's serious medical need because they "took [Plaintiff's] medical complaints seriously and reasonably relied upon the doctors' recommendations in handling [Plaintiff's] condition."[7] *Id.* at 1005.

On appeal, the Seventh Circuit affirmed the district court's granting of summary judgment to the prison officials who oversaw Plaintiff's care in various forms because, while the prison officials did not know whether the plaintiff required surgery for his hernia, the officials knew Plaintiff needed medical attention and found that medical care was continuously provided to Plaintiff. *Id*. at 1010 (explaining how one prison official "investigated the situation, made sure that the medical staff was monitoring and addressing the problem, and reasonably deferred to the medical professionals' opinions."). The Seventh Circuit also found that Plaintiff's informal complaints to the prison warden, and the fact that the warden did not act in response to those informal complaints, did not constitute deliberate indifference. *Id*. at 1012 ("non-medical prison official[s]…cannot be held deliberately indifferent simply because [he] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.)" (internal citations omitted).

Here, Cunningham is a non-medical prison official due to her administrative role

---

[7] In *Johnson*, the district court denied the defendant health care administrator summary judgment because, unlike the other non-medical prison official defendants, there was a question of fact as to whether the health care administrator was responsible for the doctors' decision not to operate. *Id.* at 1014. For this reason, the health care administrator in *Johnson* was not as similarly situated to the facts in the present as the other, non-medical prison officials were.

as the HCUA. And in her role as HCUA, Cunningham responded to an inquiry about Plaintiff's medical records from Lawrence Correctional Executive II/ARB Chairman Clayton Stephenson by reviewing Plaintiff's medical records, noting that Plaintiff was to be seen by a physician regarding his left shoulder pain and abnormal MRI, and that he had multiple referrals in the process of being scheduled and thus Plaintiff was being treated within the community standard of care (Doc. 136, pp. 1, 2; Doc. 120-4, p. 2). Cunningham based her conclusion on Plaintiff's ongoing medical treatment and existing referrals to outside imaging in his medical chart. Accordingly, there is simply no evidence from which to conclude or infer that Cunningham acted with deliberate indifference as she based her conclusions on a review of Plaintiff's medical records and her reasonable deference to Lawrence's medical personnel delivering Plaintiff's medical care. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("[T]he law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so.").

Plaintiff contends that he informally spoke to Cunningham on several occasions about his medical complaints and that Cunningham indicated she would help him, but Cunningham ignored him (Doc. 117-2, pp. 10, 19). Even giving Plaintiff the benefit of the doubt on this fact, a non-medical prison official "cannot be held deliberately indifferent simply because [he] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Johnson*, 433 F.3d at 1012. Indeed, the evidence indicates that during this time, Cunningham reviewed Plaintiff's medical

records in response to the inquiry she received and been seen by physicians, that multiple outside referrals were in the process of being scheduled, as well as an MRI (Doc. 136). To the extent Plaintiff takes issue with Cunningham's purported failure to respond to his multiple informal complaints, at best Cunningham was "negligent" in her handling of Plaintiff's informal complaints. *Johnson*, 433 F.3d at 1012 (non-medical prison official's apparent failure to respond to plaintiff's informal complaint, at most, "evinces a negligent handling of the complaint and not deliberate indifference."). Accordingly, Defendant Cunningham is entitled to summary judgment.[8]

### D. Wexford

Local governments and private corporations acting under color of state law can be held liable under Section 1983 for constitutional torts arising from their own policies or customs. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). However, municipalities and private corporations such as Wexford cannot be held liable under the theory of *respondeat superior* for the constitutional torts of their agents or employees. *See id.* at 691. In short, "[t]he 'critical question' is whether the municipality had a policy, practice, or policymaker that gave rise to the harm." *Story v. Dart*, No. 19-CV-2476, 2023 WL 2612622, at *6 (N.D. Ill. Mar. 23, 2023) (quoting *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017)).

Under Plaintiff's theory, in order for *Monell* liability to be imputed to Wexford here, there must be evidence of (1) an official policy that keeps incarcerated individuals

---

[8] In light of the Court's conclusion, the Court need not address the issue of qualified immunity.

from outside imaging and providers despite Wexford's approval of the referral to do so, (2) a practice that does the same, or (3) or an action taken by an official of the corporation with final policymaking authority that disallows prisoner access to outside medical providers. *Glisson*, 849 F.3d at 379. Plaintiff contends that Wexford has a common practice keeping prisoners from accessing outside medical providers and imaging (Doc. 36, p. 2). Successfully attaching *Monell* liability to Wexford, based on Plaintiff's personal experience at Lawrence, "is necessarily more difficult for a plaintiff to demonstrate…because what is needed is evidence that there is a true municipal policy [or custom] at issue, not a random event.'" *Grieveson*, 538 F.3d at 775 (citing *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)) (internal quotations and citations omitted).

As a general matter, Plaintiff failed to offer or identify any evidence of an official policy or a practice of preventing prisoners from accessing outside medical providers. And in fact, the evidence in this case demonstrates that Plaintiff received outside imaging and care on several occasions. NP Luking wrote Plaintiff a referral to see an orthopedic specialist (Doc. 119-2, pp 474, 479) that referral was approved, and Plaintiff saw an orthopedic specialist outside of Lawrence at Carle Sports Medicine (Doc. 125-1). Plaintiff received outside MRI imaging at Carle Health System (Doc. 119-2, p. 483; Doc. 140, p. 8). Plaintiff underwent x-ray imaging of his shoulder at OneRadiology (Doc. 140, p. 9), in addition to cervical spine imaging at Trident Care Imaging (*Id.* at 11). In short, there is simply no evidence to support Plaintiff's *Monell* claim against Wexford. Rather, the evidence shows that Plaintiff, on numerous occasions, was referred out for imaging and care. As a result, Wexford is entitled to summary judgment.

## CONCLUSION

The motions for summary judgment (Docs. 116, 118, 120) are **GRANTED.** Summary judgment is **GRANTED** as to Defendants Doris Williams, Lynn Pittman, Carissa Luking, Lorie Cunningham, and Wexford Healthcare Sources. Plaintiff's claims are **DISMISSED with prejudice** and the Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: September 17, 2026**

Mark A. Beatty

**MARK A. BEATTY**
**United States Magistrate Judge**